Mrs. John F. PARK, Plaintiff,

v.

Orval E. FAUBUS, Nathan Gordon, Bruce Bennett, Kelly Bryant, Jimmy "Red" Jones, Nancy J. Hall, Sam Jones, Leon Catlett and John Paul Hammerschmidt, Defendants.

No. LR 64 C 166.

United States District Court
E. D. Arkansas, W. D.

Feb. 3, 1965.

John F. Park, Little Rock, Ark., for plaintiff.

Bruce Bennett, El Dorado, Ark., Jack Lessenberry, Little Rock, Ark., for defendants.

Before MEHAFFY, Circuit Judge, HENLEY, Chief District Judge, and YOUNG, District Judge.

YOUNG, District Judge.

This class action was instituted by Mrs. John F. Park, a citizen, resident, and qualified voter of Pulaski County, Arkansas, a county within the Second Congressional District of Arkansas, pursuant to 28 U.S.C. § 1343(3) and 42 U.S. C. § 1983 and § 1988, against the defendants—Orval E. Faubus, Governor of the State of Arkansas; Nathan Gordon, Lieutenant Governor of the State of Arkansas; Bruce Bennett, Attorney General of the State of Arkansas; Kelly Bryant, Secretary of State; Jimmy "Red" Jones, State Auditor; Nancy J. Hall, State Treasurer; Sam Jones, State Land Commissioner; Leon Catlett, State Chairman of the Democratic Central Committee of the majority political party in Arkansas; and John Paul Hammerschmidt, State Chairman of the Republican Central Committee.

It is alleged that Act 5 of the Second Extraordinary Session of the Acts of the General Assembly of the State of Arkansas for the year of 1961, Ark.Stat.Ann. §§ 3–516 to 3–520 (Supp.1963), being the Act which divides the State of Arkansas into congressional districts, deprives plaintiff and others similarly situated of their right to vote, in violation of (1) Art. 1, § 2 of the United States Constitution, which provides that "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States * * *"; (2) the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment; and (3) that part of Section 2 of the Fourteenth Amendment which provides that "Representatives shall be apportioned among the several States according to their respective numbers, * * *." Plaintiff also prayed that the defendants be enjoined from conducting an election under Act 5 of the Second Extraordinary Session of 1961, and that, if the Legislature of the State of Arkansas does not reapportion the Congressional Districts within a reasonable time, this Court reapportion said Districts.[1]

The defendants are all the members of the State Board of Election Commissioners created by Ark.Stat.Ann. § 3–607 (Repl. 1956), which is charged with the responsibility of conducting the general elections held in the State, and of certifying the returns from such elections. In addition, the defendant Kelly Bryant,

---

1. A three-judge court was convened pursuant to 28 U.S.C. § 2281 et seq.

as Secretary of State, is charged with the responsibility of canvassing the returns of election in the presence of defendant Orval E. Faubus, as Governor of the State, and the Governor is charged with the responsibility of declaring the person having the highest number of votes to be duly elected to represent the State in the House of Representatives of the Congress of the United States and of granting a certificate thereof under the seal of his office to the person so elected, pursuant to Ark.Stat.Ann. § 3–1015 (Repl. 1956).

This case has been submitted to the Court on stipulated facts which concede the capacity of the plaintiff to bring this class action; the official status of the defendants; and the population figures as shown by the 1960 census.

The population of the State of Arkansas and of each Congressional District created by Act 5 is as follows:

| District | | |
|---|---|---|
| District 1 | | 360,183 |
| District 2 | | 517,860 |
| District 3 | | 332,844 |
| District 4 | | 575,385 |
| TOTAL POPULATION | | 1,786,272 |

From these population figures, it follows that if Arkansas' four Congressional Districts were evenly divided according to the 1960 census, the "IDEAL CONGRESSIONAL DISTRICT" should have a population of 446,568. It also follows:

1. That the First District, with a population of 360,183, is 86,385 (or 19.36%) below the "IDEAL CONGRESSIONAL DISTRICT."

2. That the Second District, with a population of 517,860, is 71,292 (or 15.96%) above the "IDEAL CONGRESSIONAL DISTRICT."

3. That the Third District, with a population of 332,844, is 113,724 (or 25.46%) below the "IDEAL CONGRESSIONAL DISTRICT."

4. That the Fourth District, with a population of 575,385, is 128,817 (or 28.84%) above the "IDEAL CONGRESSIONAL DISTRICT."

5. That the ratio between plaintiff's Second District and the Third District is 1.55 to 1, and that the ratio between the largest and smallest districts is 1.73 to 1.

In a similar case involving the Congressional Districts of Georgia, established pursuant to a 1931 Georgia Statute, the Supreme Court in Wesberry v. Sanders, 376 U.S. 1, 4, 84 S.Ct. 526, 528, 11 L.Ed.2d 481 (1964), said:

"* * * in debasing the weight of appellants' votes the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit. The question of what relief should be given we leave for further consideration and decision by the District Court in light of existing circumstances."

Again, at page 7 of the Wesberry opinion, at page 530 of 84 S.Ct., the Court said:

"We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's. This rule is followed automatically, of course, when Representatives are chosen as a group on a statewide basis, as was a widespread practice in the first 50 years of our Nation's history. It would be extraordinary to suggest that in such statewide elections the votes of inhabitants of some parts of a State, for example, Georgia's thinly populated Ninth District, could be weighted at two or three times the value of the votes of people living in more populous parts of the State, for example, the Fifth District around Atlanta. Cf. Gray v. San-

ders, 372 U.S. 368 [83 S.Ct. 801, 9 L.Ed.2d 821]. We do not believe that the Framers of the Constitution intended to permit the same vote-diluting discrimination to be accomplished through the device of districts containing widely varied numbers of inhabitants. * * * "

In discussing the term *"as nearly as is practicable"* with respect to the proposition that one man's vote in a congressional election is to be worth as much as another's, the Court in Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964), said:

"In Wesberry v. Sanders, supra, the Court stated that congressional representation must be based on population as nearly as is practicable. In implementing the basic constitutional principle of representative government as enunciated by the Court in Wesberry—equality of population among districts—some distinctions may well be made between congressional and state legislative representation. Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, so long as the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way. Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting * * *."

While the disparity between the inhabitants of the Third District (332,-844) and the inhabitants of the Second District (517,860) is not as great as that involved in Wesberry v. Sanders, supra, it is obvious from a study of these census figures that one man's vote in the Second District is not worth as much as another man's vote in the Third District. It is also obvious that the Districts are not based upon population *"as nearly as is practicable."* Therefore, this Court must hold said Act unconstitutional and void on the basis that it debases the plaintiff's right to vote.

This leaves the question of the affirmative relief to which the petitioner is entitled. That is, can (or should) this Court redistrict the State into Congressional Districts if the General Assembly of the State of Arkansas does not do so in a reasonable time. Or to state the question in another manner, does the petitioner have a right to have the State of Arkansas divided into Congressional Districts?

The Constitution of the United States, Art. 1, § 4, provides:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."

Congress, pursuant to the above section, has passed, from time to time, laws dealing with the division of states into congressional districts. The last such law, under date of November 15, 1941, 2 U.S.C. § 2a(c) [2], provides as follows:

"(c) Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment

---

**2.** Title 2 U.S.C.A. § 3, requiring congressmen in states having more than one representative to be elected by districts containing as nearly as practicable an equal number of inhabitants, expired by its own

limitation upon the enactment of the Reapportionment Act of June 18, 1929. See Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932).

shall be elected in the following manner: (1) * * * or (5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large."

Following the 1960 census, Arkansas was reduced from six congressmen, with six Congressional Districts, Ark.Stat.Ann. § 3–509 et seq., to four congressmen, and, under 2 U.S.C. § 2a(c), if the Legislature of the State of Arkansas had taken no action the congressmen would have been required to run at large. In that situation petitioner would have had no right to apply to this or any other court to prevent the election of congressmen in such manner. Can the fact that the Legislature of the State of Arkansas made an abortive attempt to district the State, by passing Act 5, give the petitioner any additional rights with respect to a division of the State into Congressional Districts? We think not. It would appear that the effect of holding the redistricting unconstitutional merely places the State and petitioner in the same position that they stood before the passage of any act at all.

Wesberry v. Sanders, supra, was remanded by the Supreme Court with this statement: "The question of what relief should be given we leave for further consideration and decision by the District Court in light of existing circumstances."

In Bush v. Martin, 224 F.Supp. 499 (S.D.Tex.1963), Texas' Congressional Districting Act was declared unconstitutional and the Court there left all of Texas' twenty-three congressmen to run

3. See Martin v. Bush, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964), indicating that a stay was granted by Justice Black pending appeal.

4. Missouri Constitution, Art. III, § 45, V.A. M.S.

5. The Arkansas Constitution makes no reference to the election of congressmen.

at large without any attempt at reapportioning the State on its own.[3]

In Preisler v. The Secretary of State of Missouri, 238 F.Supp. 187 (W.D.Mo. 1965), it was said:

"Here, it appears the State Legislature of Missouri has an unmistakable duty to reapportion the Congressional Districts of that State in accordance with the principles enunciated in Wesberry v. Sanders; * * *."

But the Missouri Constitution[4], unlike the Constitution of the State of Arkansas,[5] provides that, after each decennial census, "the general assembly shall by law divide the state into districts corresponding with the number of representatives to which it is entitled, which districts shall be composed of contiguous territory as compact and as nearly equal in population as may be."

■ Thus it appears that the petitioner has no right under the laws of the United States or the State of Arkansas to cause the State of Arkansas to be divided into Congressional Districts, and we so hold.

■ The better practice may be to divide the State into districts.[6] However, the running of only four congressmen at large would not present such problems as would call upon this Court to exercise any supposed equitable or inherent authority in a matter that has been left by the framers of the Constitution to the legislatures of the states or to Congress.

Since Act 5 is unconstitutional, the defendants will be restrained from conducting any further elections in accordance with its provisions. Further than that, we need not go.

6. Over the years the State has been divided into the following districts by the General Assembly: two districts, Ark. Acts 1853, Jan. 3, p. 60; three districts, Ark.Acts 1861, No. 177; four districts, Ark.Acts 1875, No. 10; five districts, Ark.Acts 1883, No. 100; six districts, Ark.Acts 1891, No. 152; seven districts, Ark.Acts 1901, No. 145; six districts, Ark.Acts 1951, No. 297; four districts, Ark.Acts 1961, No. 5.